ORIGINAL

Approved: _Daniel Richenthal_
         DANIEL C. RICHENTHAL/RAHUL MUKHI/JANIS M. ECHENBERG
         Assistant United States Attorneys

Before:  THE HONORABLE SARAH NETBURN
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**
                                  :
     - v. -                       :      Violation of
                                  :      18 U.S.C. § 371
NG LAP SENG and                   :
JEFF C. YIN,                      :
                                  :      COUNTY OF OFFENSE:
                                  :      NEW YORK
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - - x

**15 MAG   3369**

SOUTHERN DISTRICT OF NEW YORK, ss.:

     RYAN CAREY, being duly sworn, deposes and says that he is a
Special Agent with the Federal Bureau of Investigation ("FBI"), and
charges as follows:

<u>COUNT ONE</u>

(Conspiracy to Obstruct the Function of and to Make False Statements
     to United States Customs and Border Protection)

     1.   From at least in or about January 2013, up to and including
at least in or about September 2015, in the Southern District of New
York and elsewhere, NG LAP SENG and JEFF C. YIN, the defendants, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
defraud the United States and an agency thereof and to commit an
offense against the United States.

     2.   It was a part and an object of the conspiracy that NG LAP
SENG and JEFF C. YIN, the defendants, and others known and unknown,
would and did obstruct and defraud the United States, and an agency
thereof, to wit, United States Customs and Border Protection ("CBP"),
by impeding, impairing, defeating, and obstructing the lawful
functions of CBP in monitoring the importation of currency into the
United States, in violation of Title 18, United States Code, Section

371, to wit, NG and YIN agreed to obstruct the function of CBP by making misstatements with respect to and concealing the true purpose of the importation of millions of dollars of United States currency.

3.   It further was a part and an object of the conspiracy that NG LAP SENG and JEFF C. YIN, the defendants, and others known and unknown, in a matter within the jurisdiction of the executive branch of the Government of the United States, would and did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device a material fact, and would and did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in violation of Title 18, United States Code, Section 1001, to wit, NG and YIN agreed to make misstatements to CBP with respect to, and to conceal from CBP, the true purpose of the importation of millions of dollars of United States currency.

### Overt Acts

4.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.   On or about April 18, 2014, NG LAP SENG, the defendant, falsely told CBP at John F. Kennedy International Airport that he intended to gamble in Las Vegas, Nevada with more $300,000 in United States currency he was seeking to bring into the United States.

b.   On or about June 13, 2014, NG LAP SENG and JEFF C. YIN, the defendants, brought a suitcase containing approximately $400,000 in cash that NG had falsely told CBP was for the purchase of paintings and gambling in a meeting in Queens, New York with an individual to whom they had directed that funds be provided in the recent past, including via check ("Business Associate-1").

c.   On or about June 14, 2014, NG LAP SENG and JEFF C. YIN, the defendants, met with Business Associate-1 in New York, New York.

(Title 18, United States Code, Section 371.)

The bases for deponent's knowledge and for the foregoing charge are, in part, as follows:

5.     I have been a Special Agent with the FBI for approximately five years, and I have been personally involved in the investigation of this matter.

6.     This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my review of email correspondence, my analysis of bank of records, my examination of documents and reports by others, my interviews of witnesses, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of this or related investigations. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

**OVERVIEW**

7.     As set forth in greater detail below, the FBI's investigation has revealed that NG LAP SENG and JEFF C. YIN, the defendants, have concealed consistently and over a period of more than two years the true purpose of their importation of more than $4.5 million in United States currency, repeatedly falsely claiming to CBP officials on multiple occasions that the imported cash was being used for the purchase of art and antiques or real estate, or for gambling, when in truth and in fact the more than $4.5 million in cash was not principally used or intended to be used for these purposes.

3

**THE DEFENDANTS**

8.    From my review of documents, including emails, and my
conversations with law enforcement officers and others, I have learned
the following about the defendants, in substance and in part:

a.    Defendant NG LAP SENG ("NG") is a Chinese national
and the head of a major real estate development company based in Macau,
China.

b.    Defendant JEFF C. YIN ("YIN") is the principal
assistant to defendant NG LAP SENG.  For at least several years, YIN
has assisted NG with, among other things, wiring money to the United
States at the direction of NG, making travel plans to and from the
United States, and arranging meetings for NG in the United States,
including in New York, New York, and China.  YIN serves as NG's
principal interpreter when NG is in the United States, travels with
him to the United States, at times speaks to CBP officials on NG's
behalf as well as his own, and is generally present for meetings NG
has in the United States, including in New York, New York, taking
notes and handling documents, among other things.  YIN is a
naturalized United States citizen who was born in China, and resides
in China.

9.    On or about July 30, 2014, in New York, New York, I
personally served NG LAP SENG, the defendant, with a federal subpoena
in connection with an unrelated investigation.  The subpoena required
personal appearance on September 17, 2014.  I know from speaking with
other law enforcement agents that NG failed to appear as directed
or otherwise respond to the subpoena.

4

## THE SCHEME

### *THE DEFENDANTS' IMPORTATION OF MORE THAN $4.5 MILLION IN CASH*

10.    Based on my review of documents and my conversations with other law enforcement agents, I have learned that NG LAP SENG and JEFF C. YIN, the defendants, have traveled together to the United States from China, often by private plane, multiple times a year, staying for very short periods of time (often just a day or two and always less than a week), since at least in or about 2007.  Since in or about January 2013, during his trips, NG, assisted by YIN, has brought in more than $4.5 million in United States currency ("cash").[1] For example:

| Date of Arrival | Amount of Cash | Date of Departure |
|---|---|---|
| July 12, 2013 | $200,000 | July 13, 2013 |
| August 30, 2013 | $320,000 | August 31, 2013 |
| October 16, 2013 | $200,000 | October 20, 2013 |
| November 27, 2013 | $250,000 | December 1, 2013 |
| January 10, 2014 | $260,000 | January 11, 2014 |
| March 6, 2014 | $300,000 | March 8, 2014 |
| April 18, 2014 | $300,000 | April 21, 2014 |
| June 13, 2014 | $390,000 | June 16, 2014 |
| December 23, 2014 | $200,000 | December 26, 2014 |
| July 5, 2015 | $900,000 | July 11, 2015 |
| September 16, 2015 | $500,000 | September 19, 2015 (planned) |

---

[1]    Based on my review of documents and my conversations with other law enforcement agents, I have learned that NG LAP SENG and JEFF C. YIN, the defendants, also brought in a far smaller amount of Hong Kong dollars on occasion.

**THE DEFENDANTS' FALSE EXPLANATIONS FOR THEIR IMPORTATION OF CASH**

11.   Based on my review of documents, I have learned that, as required by 31 U.S.C. § 5316 and relevant regulations, in connection with his bringing United States currency into the United States, NG LAP SENG, the defendant, submitted written declarations upon his arrival to the United States declaring that he was bringing into the United States the United States currency identified in paragraph 10 above, and, upon request, filled out or caused others to fill out and submit a form (referred to as FinCEN Form 105), which documented his importation and ownership of the cash.   Each of these declarations and forms was signed by NG, the latter under penalty of perjury.

12.   Based on my review of documents, and my conversations with other law enforcement agents, I have learned that, on multiple occasions, after NG LAP SENG, the defendant, accompanied by JEFF C. YIN, the defendant, arrived in the United States and declared that he had hundreds of thousands of dollars in United States currency, he was interviewed by one or more officers with CBP regarding why he had this cash. NG, with the assistance of YIN (who at times responded to questions on NG's behalf or acted as a translator), provided different explanations at different times, all of which, there is probable cause to believe, were false.   Certain of these trips are described in more detail below.

### Trip One: April 18, 2014 – April 21, 2014

13.   On or about April 18, 2014, NG LAP SENG and JEFF C. YIN, the defendants, arrived at John F. Kennedy International Airport in Queens, New York on a commercial flight with $300,000 of cash.   Three days later, on or about April 21, 2014, they left the United States ("Trip One").

14.   Based on my review of documents, and my conversations with other law enforcement agents, I have learned that, on or about April 18, 2014, after declaring that he had $300,000 in United States currency, NG LAP SENG, the defendant, stated, in sum, that he intended to gamble with this cash in Las Vegas, Nevada.   After being questioned as to how that could be true, given that NG had landed in New York and was due to leave New York only three days later, NG changed his story.   He stated that, rather than gambling in Las Vegas, he planned to purchase art and antiques in New York.   When asked by CBP from whom he intended to purchase the art and antiques with this cash, NG stated

that while he did not know where he would be making these purchases, his secretary, JEFF C. YIN, the defendant, who was with him, had the contacts for certain art and/or antiques dealers.

15.   Based on my review of documents, and my conversations with other law enforcement agents, I have learned that NG was escorted from the aircraft to the CBP interview by a certain individual ("Individual-1").  When asked by CBP what his relationship was with Individual-1, NG stated that he did not know Individual-1 personally, and that Individual-1 was someone who worked for the airline on which NG had just flown to the United States, and who had escorted him to Customs merely as a courtesy by the airline.

16.   Based on my review of documents and my conversations with other law enforcement agents, I have learned that surveillance of NG LAP SENG and JEFF C. YIN, the defendants, was performed in connection with Trip One, and, as described below, subsequent trips to the United States.  During this surveillance, NG and YIN were never apart for any meaningful period of time.  I have further learned the following, with respect to the surveillance performed in connection with Trip One:

a.   After completing his CBP interview, during which, as noted above, NG stated, among other things, that he did not know Individual-1 personally and that Individual-1 merely was escorting him to customs on behalf of the airline, NG got into a car driven by Individual-1, registered to Individual-1.

b.   On each of the nights of Trip One, NG and YIN stayed at a hotel in New York, New York.

c.   Prior to Trip One, YIN communicated on multiple occasions by email with Individual-1 at Individual-1's personal email account, concerning, among other things, travel plans of NG and YIN. These e-mails reflect that NG and YIN had business dealings with Individual-1 prior to Trip One and involving more than Individual-1's relationship with the airline.

d.   At no point in surveillance of NG and YIN in connection with Trip One were either NG or YIN, or anyone with them, seen purchasing art or antiques, or meeting with an art or antiques dealer.

17.   Based on my training and experience, and my conversations with other law enforcement agents, I have learned that merchants,

including art and antiques dealers, are generally required by federal law to file a report with the government if an individual purchases something with more than $10,000 in cash.  I have further learned that a search of a database of such reports, as of September 2015, indicates that none has been filed identifying NG LAP SENG, the defendant, or JEFF C. YIN, the defendant, as individuals who made such cash purchases during Trip One, or, for that matter, ever.[2]

18.  On or about April 19, 2014, NG LAP SENG, the defendant, returned to China.  On or about April 21, 2014, JEFF C. YIN, the defendant, returned to China.  Based on my training and experience, and my conversations with other law enforcement agents, I have learned that, as is relevant here, 31 U.S.C. § 5316 and relevant regulations require that, just as an individual must report the importation of more than $10,000 in cash, an individual must report the exportation of more than $10,000 in cash.  I have further learned that neither NG LAP SENG, the defendant, nor JEFF C. YIN, the defendant, filed such a report upon leaving the United States after Trip One.

<u>Trip Two: June 13, 2014 - June 16, 2014</u>

19.  On or about June 13, 2014, NG LAP SENG and JEFF C. YIN, the defendants, arrived at Teterboro Airport in New Jersey via private jet with $390,000 of cash.  Three days later, on or about June 16, 2014, they left the United States ("Trip Two").

20.  Based on my review of documents, and my conversations with other law enforcement agents, I have learned that, or about June 13, 2014, after declaring that he had nearly $400,000 in cash, NG LAP SENG, the defendant stated, in sum, that he intended to purchase two paintings from a particular individual ("Individual-2") and also to gamble in Atlantic City, New Jersey.

---

2    A check also indicates that no such reports have been filed with respect to the other individuals mentioned herein who at times traveled into the United States with NG LAP SENG and JEFF C. YIN, the defendants, aside from reports reflecting purchases by one of the travelling companions, most recently in 2008, for a total of approximately $57,000.

21.   Based on my review of documents and my conversations with other law enforcement agents, I have learned that surveillance of NG LAP SENG and JEFF C. YIN, the defendants, was performed in connection with Trip Two.  I have further learned the following:

a.   On each of the nights of Trip Two, NG and YIN stayed at a hotel in New York, New York.

b.   At no point in surveillance of NG and YIN in connection with Trip Two--which surveillance included, among other times, the entire business day on Friday, June 13--were either NG or YIN, or anyone with them, seen meeting with Individual-2, looking at paintings available for purchase, purchasing paintings, or gambling.

c.   The same day as their arrival in New York with nearly $400,000 in cash in a suitcase (the "June 13 Suitcase"), NG, accompanied by YIN, brought the June 13 Suitcase to a meeting in Queens, New York with Business Associate-1, to whom they had directed that funds be provided in the recent past, including via check.

d.   The following day, NG and YIN met again with Business Associate-1 in New York, New York.

e.   At no time on Trip Two were NG or YIN surveilled travelling to Atlantic City, where NG had told CBP he intended to gamble with a portion of the $400,000 in cash he was bringing in to the United States.

22.  A search of the database for cash purchases in excess of $10,000, as described in paragraph 19 above, reflects that no reports were filed identifying NG LAP SENG, the defendant, JEFF C. YIN, the defendant, or Individual-2 as individuals who made such cash purchases during Trip Two (or at any point).

23.  Based on my training and experience, and my conversations with other law enforcement agents, I have further learned that, as is relevant here, casinos are required by federal law to file a report with the government if an individual engages in a transaction involving more than $10,000 in cash in a gaming day (as recorded in its accounting records), irrespective of whether the transaction involves (i) providing cash to the casino, including purchasing chips, paying for a line of credit, betting, exchanging one currency for another, or (ii) receiving cash from the casino, including winning

money through a wager or cashing in chips. I have further learned that a search of a database of such reports, as of September 2015, indicates that none has been filed identifying NG LAP SENG, the defendant, or JEFF C. YIN, the defendant, as individuals who did so during Trip Two (or at any point since in or about 2007).[3]

24. Neither NG LAP SENG, the defendant, nor JEFF C. YIN, the defendant, filed a report declaring that they were exporting cash upon leaving the United States on or about June 16, 2014, three days after they arrived.

### Trip Three: July 5, 2015 – July 11, 2015

25. On about July 5, 2015, NG LAP SENG and JEFF C. YIN, the defendants, accompanied by an individual known to be a business associate of NG and YIN ("Business Associate-2"), arrived in the United States with $900,000 in United States currency. On or about three days later, NG left the United States, and on or about six days later, on July 11, 2015, YIN, accompanied by Business Associate-2, left the United States ("Trip Three").

26. Based on my review of documents, and my conversations with other law enforcement agents, I have learned that or about July 5, 2015, after landing by private jet in Anchorage, Alaska and declaring that he had $900,000 in cash, NG LAP SENG, the defendant, stated, in sum, through JEFF C. YIN, the defendant, who served as NG's interpreter, that NG was importing the cash because was traveling to Las Vegas to win back $2 million he had previously lost while gambling.

27. Based on my review of documents and my conversations with other law enforcement agents, I have learned that surveillance of NG LAP SENG and JEFF C. YIN, the defendants, was performed in connection with Trip Three. I have further learned the following:

a. Subsequent to their July 5, 2015 arrival in the United States with $900,000 in cash, which NG stated was for gambling, NG and YIN stayed for one night at a certain casino hotel (the "Casino") in Las Vegas, Nevada. NG gambled at Casino, using a line of credit,

---

3    A check also indicates that no such reports have been filed with respect to the other individuals mentioned herein.

not cash. The line of credit NG used was funded by a $386,000 wire from a bank account in China to a bank account of the Casino in the United States. Based on my review of documents, I have learned that, other than a few thousand dollars, when NG gambled at the Casino in the past, he also did so using a line of credit, not cash.[4]

   b. On each of the remaining nights of Trip Three, NG, YIN, and Business Associate-2 stayed at a hotel in New York, New York.

   c. After their arrival in New York during Trip Three, on or about July 7, 2015, YIN met, in New York, New York, with Business Associate-1 and, among other things, exchanged documents. NG and Business Associate-2 were sitting at an adjacent table during this meeting. Later the same morning, NG, Individual-1, and Business Associate-1 met.

  28. A search of the database for reports of cash in or out of a casino in excess of $10,000 indicates that none has been filed identifying NG LAP SENG, the defendant, JEFF C. YIN, the defendant, or the Business Associate as individuals who did so during Trip Three (or at any point since in or about 2007).

  29. Based on my review of documents, and my conversations with other law enforcement agents, I have learned that, on or about July 11, 2015, JEFF C. YIN, the defendant, accompanied by Business Associate-2, arrived at John F. Kennedy International Airport to take a flight from New York to China, returning home less than a week after their arrival. During a search, CBP discovered less that Business Associate-2 had $100,000 in cash in his carry-on, which he had not declared, contrary to federal law. YIN and Business Associate-2 were then interviewed by United States authorities prior to departure. Business Associate-2 stated, in sum, that the cash was leftover cash, which had been used to pay for a renovation to a house in the United States. YIN stated that NG LAP SENG, the defendant, was paying for the renovation, and that the leftover cash belonged to NG. As noted above, when NG and YIN had arrived together in the United States less

---

4 Based on my review of documents, I have learned that the wire that NG LAP SENG, the defendant, caused to be sent to the Casino was not the only wire he has sent or caused to be sent to the United States. On the contrary, since in or about 2010, NG has wired more than $19 million to bank accounts of entities and/or individuals in the United States.

than a week earlier, with $900,000 in United States currency, NG had
told CBP, through YIN, that the money cash was going to be used for
gambling.

### Trip Four: September 16, 2015 - Present

30.   On or about two days ago, September 16, 2015, NG LAP SENG
and JEFF C. YIN, the defendants, arrived in the United States via
private jet in Anchorage Alaska with $500,000 in United States
currency.  Based on my review of documents and my conversations with
other law enforcement officers, I have learned that they were
accompanied by Business Associate-2, and intend to return to China
on or about tomorrow, September 19, 2015.

31.   Based on my review of documents, and my conversations with
other law enforcement agents, I have learned that, on or about
September 16, 2015, after landing in Anchorage, Alaska and declaring
that he had $500,000 in cash, NG LAP SENG, the defendant, stated,
in sum, through JEFF C. YIN, the defendant, who served as NG's
interpreter, that NG was traveling to New York to purchase real estate
and that the cash was for this purpose.

32.   Based on my review of documents and my conversations with
other law enforcement agents, I have learned that surveillance of
NG LAP SENG and JEFF C. YIN, the defendants, has been performed in
connection with their September 16, 2015 trip to the United States.
I have further learned that, to date, neither NG nor YIN has been
seen touring property currently on the market.  After their arrival
in New York, NG and YIN were driven by Individual-1 to a residence

on Long Island owned by Business Associate-2, and then to a hotel in New York, New York, where they are staying.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of NG LAP SENG and JEFF C. YIN, the defendants, and that they be imprisoned or bailed, as the case may be.

RYAN CAREY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
18th day of September, 2015

THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK